First National Bank of Los Angeles, Appellee, v. The National Produce Bank of Chicago, Appellant.

Gen. No. 30,147.

1. BANKING—*power of national bank to act as accommodation guarantor of acts of another.* A national bank has no power, under the national banking acts, to guaranty, merely for the accommodation of another, the performance of an obligation in which it has no interest and from which it derives no benefit.

2. GUARANTY—*sufficiency of evidence to show agreement of bank as to payment of draft upon depositor a contract of guaranty.* Evidence held to show, in an action by one national bank against another based upon a contract created by telegrams from defendant to plaintiff guaranteeing payment of certain drafts covering intended shipments to defendant's depositor, that the contract was one by defendant to pay said drafts in the event of their nonpayment by the depositor.

3. GUARANTY—*sufficiency of evidence to show agreement of bank as to payment of draft upon depositor a contract of guaranty for accommodation.* Evidence held to show, in an action by one national bank against another upon a contract created by telegrams from defendant to plaintiff guaranteeing payment of certain drafts covering intended shipments to a depositor of defendant, that the contract was one of guaranty for the accommodation of the depositor, for the performance of an obligation in which defendant had no interest and from which it derived no benefit.

4. GUARANTY—*sufficiency of evidence to show knowledge of promisee that guaranty for accommodation and ultra vires the guarantor.* In an action by one national bank against another upon a contract created by telegrams from defendant to plaintiff guaranteeing payment of certain drafts covering intended shipments to a depositor

of the defendant, evidence held to show that plaintiff had full knowledge of the fact that such contract was one of guaranty, for the accommodation of the primary obligor, that defendant had no interest therein and derived no benefit therefrom, and that such contract was beyond the power of the defendant, under its charter, to make.

5. BANKING—*agreement of national bank as to payment of draft upon customer as letter of credit.* Telegrams from one national bank to another, stating "Payment guaranteed" as to certain drafts therein described as drawn by the consignor of certain shipments and against the consignee thereof, sent at the request of such consignee, a depositor of the sender bank, cannot be construed as a letter of credit and hence binding upon the sender bank, since the telegrams, constituting the sole evidence of such contract, contained no promise to pay a draft drawn on the sending bank, nor promise to pay any draft in the first instance, nor did they show any facts warranting an inference that such was the intention or understanding of the parties.

Appeal by defendant from the Superior Court of Cook county; the Hon. JOHN J. SULLIVAN, Judge, presiding. Heard in the second division of this court for the first district at the March term, 1925. Reversed. Opinion filed February 2, 1926.

LOUCKS, ECKERT & PETERSON, for appellant; SCHUYLER, ETTELSON & WEINFELD, of counsel.

GARDNER, FOOTE, BURNS & MORROW, for appellee; WALTER M. FOWLER, of counsel.

MR. JUSTICE FITCH delivered the opinion of the court.

This is an appeal from a judgment for $4,387.51, based upon two telegrams from defendant to plaintiff, in code, the first of which, when translated, reads as follows:

"Payment guaranteed Fay Fruit Company draft on Nellis & Co. for $1,943 covering car oranges SFRD 8687 invoice and bill of lading attached to draft," and the second of which, when translated, reads as follows:

"Payment guaranteed Fay Fruit Company draft on

Nellis & Co. for $2,006.05 covering car oranges SFRD 12381 invoice and bill of lading attached to draft.''

It was stipulated that the letters ''SFRD'' mean Santa Fe Refrigerator Dispatch.

These telegrams are dated May 7, 1920, and were sent by defendant to plaintiff upon the written request of F. E. Nellis & Company, of Chicago, to ''Kindly wire First National Bank of Los Angeles, Calif., guaranteeing payment of the Fay Fruit Co.'s draft on us'' for the amounts and purposes mentioned in the telegrams. It appears from the evidence that when these telegrams were sent, Nellis & Company was a depositor in the defendant bank, and had been such for at least ten years, and it was stipulated that its deposit with defendant bank was at all times considerably more than enough to cover the amount of both drafts. The defendant's cashier testified that the account was an ordinary checking account and ''there was no stop of any kind on any portion of it''; that defendant did not set aside any deposits of Nellis & Company or make any charge of any kind against their account, ''or any notation of any character,'' to protect itself on these drafts, and ''did not receive anything of any character'' from Nellis & Company for sending the telegrams to the plaintiff. This testimony was not contradicted. The cashier also testified that ''it was a pure accommodation on our part,'' but this statement was stricken out by the court as a conclusion of the witness.

When the telegrams were received by the plaintiff it notified the Fay Fruit Company of that fact, and on May 11, 1920, purchased from that company two drafts, dated May 8, 1920, corresponding to the telegrams and sent them, with invoices and bills of lading attached, to its correspondent in Chicago for collection. Meantime, the cars of oranges had arrived in Chicago, consigned to Nellis & Company, but as no bills of lading had been sent to the consignee, the railroad company

refused to deliver the oranges, and a delay of one day occurred before the railroad company was authorized by telegram from the Fay Fruit Company to "release the cars" to Nellis & Company. When that was done, Nellis & Company inspected the oranges and, finding that about one-fourth of the fruit had decayed and become unmarketable, refused to accept the shipment.. When the drafts arrived in Chicago, they were first presented to defendant and not paid, and then to Nellis & Company, and, upon the refusal of the latter to pay them, were protested.

The declaration is in assumpsit, containing the common counts and a special count upon the telegrams. The defense is that the contract specially declared on is ultra vires and void.

Both parties to the suit are national banks, but their counsel disagree as to the legal effect of the telegrams. Defendant's counsel contend that the telegrams are not promises to pay drafts drawn on the defendant, but are promises by defendant to guarantee the payment of drafts drawn on a third party, and that such promises, when made by one national bank to another, in a matter in which the promisor has no interest, are ultra vires and void. Plaintiff's counsel contend that the telegrams are, in legal effect, letters of credit, which national banks have power to issue as incident to their banking business.

In *Border Nat. Bank v. American Nat. Bank*, 282 Fed. 73, 77, it is said:

"A guaranty is a promise to answer for the payment of some debt, or the performance of some obligation, in case of the default of another person, who is in the first instance liable for such payment or performance. A letter of credit confers authority upon the person to whom it is addressed to advance money or furnish goods on the credit of the writer. Daniel on Negotiable Instruments (6th Ed.), §§ 1752, 1790, 12 R. C. L. 1053, 1065. It is well settled that the guaranty

of a national bank is ultra vires. 3 R. C. L. 425. But a national bank is bound by its letter of credit. *Decatur Bank v. St. Louis Bank*, 21 Wall. [U. S.] 294, 22 L. Ed. 560.''

In the present case, the telegrams upon which the suit is brought do not, in terms, purport to confer any authority upon plaintiff to advance money ''on the credit of the writer.'' If that had been the intention of ''the writer'' (defendant), it would have been an easy and simple matter for it to use language appropriate to express that intention, as was done in *American Steel Co. v. Irving Nat. Bank*, 266 Fed. 41. While such a guaranty as is above defined is not necessarily imported by the use of the word ''guarantee'' (12 R. C. L. 1055), yet that is the ordinary acceptation of the word (12 R. C. L. 1053), and if there are no facts or circumstances indicating a different intention, the words used by the parties themselves must be given their ordinary and usual meaning. As we view the evidence, there are no facts or circumstances in the record that indicate a different intention and none that are not entirely consistent with the ordinary meaning of the language employed. The telegrams purport, in terms, to guarantee the payment of the drafts of the Fay Fruit Company *upon Nellis & Company* for the agreed price of oranges sold by the former to the latter. The drafts had not been drawn at the time the telegrams were sent, but were drawn the next day thereafter. Upon the face of each of them, and above the signature of the Fay Fruit Company, was written, in red ink, presumably before plaintiff purchased the same: ''Guaranteed by Nat. Produce Bank, Chicago, Ill., May 7/20.'' Nellis & Company was the drawee named in the drafts and was primarily liable; and if any effect is to be given to the ordinary meaning of the word ''guarantee,'' appearing both in the telegrams and upon the face of the drafts, defendant's telegrams certainly come within the above-quoted definition of

guaranties. If that word was used in any other or different sense, the burden was on the plaintiff to show that fact, and no such fact was shown.

The general rule is well settled that a national bank has no power, under the national banking acts, to guarantee, merely for the accommodation of another, the performance of obligations in which it has no interest, and from which it derives no benefit. (*Bowen v. Needles Nat. Bank*, 36 C. C. A. 553, 94 Fed. 925.) "Such an act is an adventure beyond the confines of its charter, and, when its true character is known, no rights grow out of it." (*Merchant's Bank of Valdosta v. Baird*, 90 C. C. A. 338, 160 Fed. 642.) If a bank transcends its power in this respect, its obligation is totally void in the hands of one having notice of the fact that it was made for accommodation. (Morse on Banks and Banking—5th ed.—secs. 65, 745.)

"A national bank may indorse or guaranty the payment of commercial paper which it holds, when it rediscounts or disposes of the same in the ordinary course of business. Such power, it seems, a national bank may exercise as incident to the express authority conferred on such banks by the national banking act to discount and negotiate promissory notes, drafts, bills of exchange, and other evidences of debt (*Peoples' Bank v. Manufacturers' Nat. Bank*, 101 U. S. 181, 183; *United States Nat. Bank v. First Nat. Bank*, 49 U. S. App. 67, 24 C. C. A. 597, and 79 Fed. 296); but it has never been supposed that the board of directors of a national bank can bind it by contracts of suretyship or guaranty which are made for the sole benefit and advantage of others. The national banking act confers no such authority in express terms or by fair implication, and the exercise of such power by such corporations would be detrimental to the interests of depositors, stockholders, and the public generally." (*Commercial Nat. Bank v. Pirie*, 27 C. C. A. 171, 82 Fed. 799, 802.)

The case of *First Nat. Bank v. American Nat. Bank,*
173 Mo. 153, is a case which is very similar to this case.
C. C. Lieuallen, of Idaho, shipped certain potatoes to
Clemons & Co., of Kansas City, on the agreement of
the latter to advance fifty cents per hundred pounds
thereon. Lieuallen applied to the plaintiff, a national
bank in Moscow, Idaho, to cash his drafts on Clemons
& Co. for the amount agreed to be advanced, but the
plaintiff refused to cash them unless Clemons & Co.'s
bank (defendant) would telegraph the plaintiff to pay
the drafts. Thereupon, at Clemons & Co.'s request, his
bank sent two telegrams to the Idaho bank, the first of
which reads as follows:

"Drafts of C. C. Lieuallen drawn on C. C. Clemons
& Company with bills lading attached for three cars
choice sacked potatoes, valuation fifty cents per hun-
dred pounds, will be paid."

The second is in the same form except the statement
that it is for "three more cars." On receipt of these
telegrams, the Idaho bank cashed three drafts drawn
by Lieuallen on Clemons & Co., payable to that bank,
and having the bills of lading for the potatoes attached
thereto. The drafts were dishonored by Clemons &
Co. and payment was refused by the Kansas City bank,
although Clemons & Co. received all the potatoes and
sold them, and never paid for them. The Idaho bank
brought suit against the Kansas City bank on the
drafts. The main defense was ultra vires, to which
the plaintiff pleaded estoppel. The opinion states that:

"The trial took a wide range, as to the character of
the potatoes, the custom of banks in like cases, and the
meaning of the telegrams themselves, as to whether
they would be taken in banking circles to be a promise
by the bank to pay the drafts or that Clemons would
pay them, or simply as an expression of opinion as to
Clemons & Company's standing and financial responsi-
bility."

It was admitted that Clemons & Co. were customers

of the defendant bank and had on general deposit with it, at the time, more than enough money to pay the drafts, though none of it had been specially set apart for that purpose.

After reciting these facts in its opinion, the court held, in substance, that the powers of a national bank are essentially matters for federal construction and interpretation, and that State courts must yield to the decisions of the federal courts construing the powers of such banks under the national banking act; that section 5136 of the United States Compiled Statutes of 1901, vol. 3, prescribes the powers of national banks; that:

"This law has undergone thorough and exhaustive adjudication in the courts of the United States, and, briefly stated, the rule declared is that a national bank has no power, either with or without a sufficient consideration, to agree or bind itself that a draft of A. upon B. will be paid; that such agreement is a mere guaranty and is not within the powers conferred upon such banks, and that when sued upon such a contract the bank can successfully interpose a defense of ultra vires," citing a number of federal decisions and quoting at length from the opinion in *Commercial Nat. Bank v. Pirie, supra.* The opinion adds that "this rule of the federal courts has been yielded to and enforced in State courts," citing *Thilmany v. Iowa Paper Bag Co.*, 108 Iowa 357, and *Groos v. Brewster* (Tex.), 55 S. W. 590, and concludes that the contract is void and the plaintiff is not entitled to recover.

In *National Bank of Brunswick v. Sixth Nat. Bank,* 212 Pa. St. 238, Brown & Co. were dealers in melons in the State of Georgia, and J. F. Eilenberg was a produce dealer in the City of Philadelphia. On June 17, 1902, the cashier of the Sixth National Bank, of Philadelphia (defendant) wrote to the National Bank of Brunswick, Georgia (plaintiff), as follows:

"We will accept drafts drawn on J. F. Eilenberg by

384    Appellate Courts of Illinois

First National Bank v. National Produce Bank, 239 Ill. App. 376.

Brown & Company for watermelons and cantaloupes, melons not to exceed $100 per car and cantaloupes not to exceed $500 per car, bills of lading attached, until further notice.''

In reply, the cashier of the plaintiff wrote:

''We beg to own receipt of your valued favor of the 17th inst., guaranteeing drafts to be made by Brown & Company, on J. F. Eilenberg against bills of lading for watermelons and cantaloupes at the rate of $100 per car for the former and $500 per car for the latter.''

Thereafter Brown & Co. drew nine sight drafts on Eilenberg in favor of the plaintiff, and attached to each draft a bill of lading for a carload of melons. By agreement between the plaintiff and Brown & Co., these drafts were placed to the credit of another depositor in that bank and the credit given to such other depositor was the consideration paid for the drafts by the plaintiff. Seven of them were sent by plaintiff to its Philadelphia correspondent, and when payment was refused, plaintiff brought suit in assumpsit against the Philadelphia bank on its promise above quoted. The court held that ''defendant's contract was a guaranty of the payment of the drafts by Eilenberg to be drawn on him by Brown & Company, in payment for the melons''; and that a national bank has no power ''to become accommodation indorser or guarantor of the payment of the debt of another without benefit to itself.'' The opinion states that: ''So far as we are advised, the question has not been determined by the Supreme Court of the United States, but the inferior courts of that jurisdiction have uniformly put this construction on the powers of a bank chartered under the national banking act, and as the subject is one of federal origin and of federal control, we must follow those precedents.''

In *Nowell v. Equitable Trust Co.*, 249 Mass. 585, 144 N. E. 749, Lee, Higginson & Co., bankers, issued a letter of credit to the J. F. Mosser Co., Inc., engaged

in trade in Argentina, in the sum of $50,000, on the written agreement of the latter, contemporaneously executed, to furnish funds to meet all drafts drawn by it against the letter of credit one day before maturity. Thereafter, the Equitable Trust Co. executed an agreement by the terms of which it did "guarantee, promise and agree to and with" Lee, Higginson & Co. that the Mosser Co. would perform its agreement. In an action brought by Lee, Higginson & Co. under the guaranty, the trust company contended the contract of guaranty was ultra vires. It appears from the opinion that the powers of a trust company under the Massachusetts laws at that time were similar to those of a national bank under the national banking act, and the court said as to the agreement of the trust company:

"It was not an agreement to pay drafts or bills of exchange drawn on this trust company. It was not an acceptance of such instruments already drawn or to be drawn in the future. It was not the issuance of a letter of credit.  *  *  *  It related to payment of drafts arising out of importations of goods and to liabilities primarily undertaken under a letter of credit. The drafts which were the subject of the guaranty were not drawn on the guarantor, but on the plaintiffs. The letter of credit was not issued by the defendant, but by the plaintiffs. The security of the bills of lading and other papers and of the imports was not assured to the defendant but to the plaintiffs.  *  *  *  *A guaranty of the financial obligations incurred by an importer to another banker is different in kind from the business described in the sections delimiting the corporate powers of a trust company. It is not fairly incidental to the powers there conferred.* All these considerations lead us to the conclusion that this contract of guaranty was ultra vires the trust company." (Italics ours.)

The opinion also mentions the fact that there was

uncontradicted testimony at the trial that it was the custom for trust companies to guarantee letters of credit, but the court said: ''Such a custom cannot stand against a rule of law,'' citing authorities.

The same principle is also recognized in the following cases: *First Nat. Bank v. Monroe*, 135 Ga. 614; *Fidelity & Deposit Co. v. National Bank of Commerce*, 48 Tex. Civ. App. 301, 106 S. W. 782; *Thilmany v. Iowa Paper Bag Co.*, 108 Iowa 357; *Knickerbocker v. Wilcox*, 83 Mich. 200; *Norton v. Derry Nat. Bank*, 61 N. H. 592.

It is to be noted, however, that the rule announced in the foregoing cases has no application when the contract has been fully performed by the other party and the promising bank has had the benefit of the performance and of the contract. In the Massachusetts case cited, it was held that this exception applies *only* in instances where the fruits of the ultra vires contract have enured to the benefit of the corporation setting up ultra vires as a defense, and is not applicable to cases where the benefit of the executed contract has gone to some one else. To the same effect is the case of *Citizens' Central Nat. Bank v. Appleton*, 216 U. S. 196. The uncontroverted testimony in the present case is that the defendant received no benefit whatever from its guaranty.

From the foregoing authorities, we conclude that the contract evidenced by the telegrams in question was a contract by the defendant to answer for the debt of Nellis & Company to the Fay Fruit Company for the price of the oranges therein mentioned, in case of the refusal of Nellis & Company to pay the drafts. We conclude, further, from the undisputed evidence, that defendant's contract was a guaranty, for the accommodation of Nellis & Company, of the performance of obligations in which defendant had no interest and from which it derived no benefit whatever, and that plaintiff had full knowledge of that fact and of the lack

of power on the part of the defendant, under its charter, to make such a contract. It follows, we think, that the contract was ultra vires and that no action can be maintained on it.

Plaintiff's counsel insist, however, that the Federal Court of Appeals, in several comparatively recent cases, has construed promises which are very similar to the promises of defendant to be, in legal effect, letters of credit and therefore binding upon the bank making the promises. In support of this contention, the cases of *Border Nat. Bank v. American Nat. Bank, supra; Second Nat. Bank of Hoboken v. Columbia Trust Co.*, 288 Fed. 17; *Bank of Plant City v. Canal-Commercial Trust & Savings Bank*, 270 Fed. 477, and *Pan-American Bank & Trust Co. v. National City Bank*, 6 Fed. (2d) 762, are mainly relied upon.

In *Border Nat. Bank v. American Nat. Bank, supra,* Joseph De Bona, a sugar broker at Eagle Pass, Texas, wrote Maldonado & Co., brokers in San Francisco, asking for prices on sugar. Maldonado & Co. replied offering to sell a large quantity of sugar at a certain price "upon being furnished with an irrevocable letter of credit by wire." Thereupon, at De Bona's request, his bank (the Border National) wired Maldonado's bank at San Francisco: "We guarantee irrevocably payment for account Joseph De Bona covering purchase of" the specified quantity of sugar, "*drawing on us* with railroad bills lading and/or warehouse receipts attached." The opinion states that the sugar was shipped and the sellers' bank paid out "on its letter of credit" $96,310 and then presented Maldonado & Co.'s draft for $98,594.88, payable to itself, with bill of lading, warehouse receipts and other documents, to the Border National Bank, but the latter refused payment of the draft and the sugar was sold at auction. After reviewing the correspondence between the parties, the court held that notwithstanding the use of the words "we guarantee payment," etc., it was

the intention of the parties to the sugar contract to secure it by a letter of credit, saying:

"Maldonado & Co. *required that form of security as a condition precedent to their offer. That offer was accepted by De Bona as made. The American Bank was also making the same requirement.* The Border Bank was fully cognizant of the correspondence between the parties to the sugar contract. It therefore knew of the requirement that a letter of credit be furnished. * * * The only reasonable conclusion from the evidence is that the banks, as well as the parties to the sugar contract, contemplated and intended a letter of credit. The defendant's obligation is consistent with the intention of the parties. It does not purport to secure payment *by De Bona,* but *for his account. The promise is not that defendant would pay if De Bona did not, but that defendant would pay in the first instance.*" (Italics ours.)

No such facts appear in the present case to evidence such an intention of the parties. We have here only the evidence of the telegrams themselves, and they contain no promise to pay drafts drawn *on the defendant,* nor that defendant would pay "in the first instance."

*Second Nat. Bank of Hoboken v. Columbia Trust Co., supra,* is a case similar to the one last cited. There, a concern in New York City sold to another in Hoboken 100 tons of sugar, to be shipped from Java, for which the purchaser agreed to pay "net cash against invoice * * * and delivery order, *under banker's confirmed letter of credit for $40,500,*" to be established in the seller's favor with the Columbia Trust Company. In pursuance of this contract, the purchaser's bank wrote the Columbia Trust Company: "We hereby guarantee the account of" the purchaser "to the amount of $40,500, covering their contract. * * * *We agree to pay you this amount* upon presentation of delivery order and proper document certified by transporting steamship company that the sugar

is held by them subject to delivery on presentation of said order.'' After the price of sugar had dropped, the purchaser's bank, at his direction, refused to pay the draft for the agreed price of the sugar, and the court construed the contract to be, in legal effect, a letter of credit, because that was what the parties intended. No such intention appears in the present case.

. In *Pan-American Bank & Trust Co. v. National City Bank, supra,* the opinion of the majority of the court, for the same reason, construed a similar contract, which was the result of considerable correspondence between the banks, resulting in the Pan-American bank establishing, through the City bank, ''a sight credit'' for about $800,000 with the Rio de Janeiro correspondent of the latter, ''cash against documents in New York,'' to be a letter of credit, and not a guaranty. The court said: ''The result of the paper writings in evidence was not that Pan-American guaranteed anything,'' but that it agreed to pay the City bank ''what it lawfully paid out, plus one-eighth of one per cent.'' There is a dissenting opinion by Judge Hand, who says: ''My trouble arises from the fact that the defendant's obligation was certainly intended as a guaranty in accommodation of Seago & Co. and prima facie was ultra vires,'' citing, as authority for this statement, the case of *Nowell v. Equitable Trust Co., supra;* but the conclusion of the majority of the court is based on the letters in evidence, which are wholly unlike anything in this case.

These three cases concede, or assume, that the general principle as to the powers of national banks in relation to guaranties is as stated in the earlier cases above cited, but hold that the question whether any particular transaction is ultra vires is one of intention, to which the court will give effect, when ascertained from the evidence, even though some of the language used, if standing alone, would be decisive.

In *Bank of Plant City v. Canal-Commercial Trust &*

*Savings Bank, supra,* there were two telegrams, the first of which was:

"We guarantee payment sight draft W. J. Hawkins on S. Segari Company bill of lading attached to draft covering one car tomatoes shipped yesterday fancy three dollars crate choice two seventy five."

This telegram was confirmed by letter containing the following:

"We trust that it has been convenient for you to accept our guaranty and that you will allow this draft to come to us direct for collection, we guaranteeing prompt payment."

The second telegram was as follows:

"We will honor sight draft of W. J. Hawkins bill lading attached covering car tomatoes on S. Segari & Company."

The court held that the Plant City bank was liable upon both telegrams. The opinion states that the first telegram was a "guaranty" to the plaintiff of the sight drafts which were to be drawn by Hawkins on Segari & Co., and that the second telegram was a direct promise to the Plant City bank *to pay* a specified draft, and was, in effect, a special letter of credit. Neither of the parties to that suit was a national bank, and it does not appear from the opinion that any question was raised as to the power of the defendant bank to make such a guaranty as the court held the first telegram to be.

Counsel for defendant also contend that even if it be assumed that defendant had the power to guarantee the payment of the drafts in question, still it must be held that it did so only on condition that the drafts should constitute a valid, binding obligation against Nellis & Company, and that the condition was never fulfilled. In support of this contention, counsel rely upon the case of *Merchants' Nat. Bank v. Citizens' State Bank,* 93 Iowa 650. There, one Butts, who was in the wholesale fruit business in Council Bluffs, or-

dered of one Arentz, a dealer in oranges at Ocala, Florida, a carload of oranges, which was shipped to Council Bluffs by Arentz, who made a draft on Butts for the price of the oranges, payable to the Merchants' National Bank of Ocala. Before that bank bought the draft, it required a guaranty of payment to be made by a bank in Council Bluffs, and Butts induced the cashier of the Citizens' State Bank of Council Bluffs to send the Florida bank a telegram as follows: "Will guaranty Butts' draft for car oranges from B. Arentz." The oranges arrived in Council Bluffs in bad order, and Butts refused to receive them, and refused to pay the draft. In an action brought on the guaranty, the defendant pleaded ultra vires, and also that the oranges were never delivered to Butts and that he never accepted the draft. The court held that as there was never any actual or constructive delivery of the oranges to Butts, and because of the form of the alleged guaranty,

"The conclusion is irresistible that the defendant did not undertake to guarantee the payment of anything for which Mr. Butts should not be liable. Its liability was not intended to be extended beyond his, and the form of the guaranty was sufficient notice to the plaintiff of the fact."

The court therefore held that as Butts never became liable on the draft, defendant's guaranty never became operative, and there could be no recovery.

While we think there is much force in the position taken by the Iowa court in the case last cited, we think the other reasons we have given above are decisive, and prefer to rest our conclusion on them.

The judgment of the superior court is reversed, and as the facts are not controverted and the trial was before the court without a jury, the cause will not be remanded.

*Reversed.*

Barnes, P. J., and Gridley, J., concur.