**Samuel M. RICH and Louis Rubin, Appellants,**

v.

**CLAYTON MARK & COMPANY, Appellee.**

**No. 15705.**

United States Court of Appeals Eighth Circuit.

Dec. 16, 1957.

Jesse E. Bishop, St. Louis, Mo. (Donald Gunn and Herbert Boxerman, St. Louis, Mo., with him on the brief), for appellants.

Robert F. Schlafly, St. Louis, Mo. (Fortis M. Lawder and Keefe, Doerner, Schlafly & Griesedieck, St. Louis, Mo., with him on the brief), for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

Rich and Rubin, as appellants, seek reversal of a judgment obtained against them by appellee Clayton Mark & Co. The suit is one in diversity jurisdiction, tried to the court without a jury.

The liability held to exist against appellants arises out of the failure and inability of Hamilton Tool & Mfg., Inc. to pay for some steel tubing purchased by it from Clayton Mark & Co. Three alternative theories of liability were alleged in the complaint—one, that Rich and Rubin were guarantors as to the purchases involved; another, that they were joint adventurers with Hamilton Tool in the project for which the purchases were made; and, the third, that they were guilty of fraud toward Clayton Mark & Co. in the circumstances under which they had induced it to make the sale to Hamilton Tool and had prevented it from obtaining payment therefor.

The trial court declared that the evidence was sufficient to support liability against appellants on each of the theories of the complaint.

Appellants offered no testimony at the trial. The evidence on behalf of appellee entitled the court to find, among other facts, the ones which follow.

Air-Tex Products, Inc., which was the holder of a prime contract to produce artillery shells for the Department of the Army, had given Hamilton Tool a subcontract to manufacture a certain quantity of "burster tubes" for the shells. Before it did so, however, it had required Hamilton Tool to make showing of financial ability or backing, sufficient to assure that the latter would be able to carry out the subcontract.

Hamilton Tool frankly admitted to Air-Tex that it did not itself possess the necessary resources for handling the subcontract, but it produced a letter, signed by Rich and Rubin, addressed to Air-Tex, stating that "we jointly and severally will provide adequate financing to Hamilton Tool and Manufacturing, Inc. * * * in furtherance of certain contracts issued to Hamilton Tool * * * by Air-Tex Products, Inc. * * * ". The letter contained the name of a banker, for reference as to Rich's and Rubin's financial responsibility, from whom Air-Tex sought and obtained such information. Following this, Air-Tex granted Hamilton Tool the subcontract.

Thereupon, Hamilton Tool undertook to purchase from Clayton Mark & Co. the quantity of steel tubing necessary for manufacturing the burster tubes called for by the subcontract. As inducement to make the sale, it provided Clayton Mark & Co. with a photostatic copy of the letter which Rich and Rubin had addressed to Air-Tex. Clayton Mark & Co. communicated with Air-Tex and also made inquiry as to the financial responsibility of Rich and Rubin from the banker named as a reference in the Air-Tex letter. After satisfying itself of such responsibility, it advised Hamilton Tool that it could not accept the letter to Air-Tex for its purposes, but that, in order to approve the tubing order as a credit sale, it would have to be furnished with a letter from Rich and Rubin, addressed directly to it, such as had been given to Air-Tex.

Hamilton Tool informed Rich and Rubin of this demand and told them that the giving of the letter was necessary in order "to get the tubing" from Clayton Mark & Co. with which to carry out the subcontract. Rich and Rubin thereupon signed a letter, addressed to Clayton Mark & Co., in identical language with that given Air-Tex, and mailed it from St. Louis, Mo., to Clayton Mark & Co. in Illinois. Upon its receipt, Clayton

Mark & Co. formally approved the order, on the basis of the price quotation previously made, and advised Hamilton Tool of its willingness to proceed. Hamilton Tool submitted a schedule of the various lengths desired for the total quantity of tubing covered by the order, and Clayton Mark & Co. made delivery thereof as requests for shipments were received. Rich and Rubin kept in contact with Hamilton Tool through the course of the entire operations, and knew of Clayton Mark's approval of the order upon the receipt of their letter.

All of the tubing requested by Hamilton Tool, amounting to around $50,000 in amount, was thus delivered by Clayton Mark & Co., between October and December, 1953. Payments were made by Hamilton Tool thereon of approximately $32,000. Each of the several payments made consisted of funds turned over to Hamilton Tool by Rich and Rubin for that specific purpose. In some instances, the funds represented loans or advances by Rich and Rubin to Hamilton Tool for making the payments. In others, the funds represented part of the remittances made by Air-Tex under the subcontract, as burster tubes were completed, which Rich and Rubin released for that purpose. Rich and Rubin had at the start taken an assignment from Hamilton Tool of all monies that would be coming to Hamilton Tool under the subcontract. Beyond this, they also required Hamilton Tool to execute an assignment, on the face of each invoice submitted to Air-Tex for burster tubes completed, of the amount due thereon, so that all payments made by Air-Tex would thus come into their hands and be subject to their control.

There remained a balance of $18,283.-53 owing from Hamilton Tool to Clayton Mark & Co., which Hamilton Tool was unable to pay, because Rich and Rubin refused to make any further loans to it, or to release any more of the monies which it held from payments made by Air-Tex. Rich and Rubin had by that time decided to protect themselves, by holding onto all funds, which were then in their hands, or which should thereafter be received from Air-Tex, and applying the money against the financing which they had up to that point done as to the subcontract. They also instituted foreclosure on a chattel mortgage, which they had taken from Hamilton Tool, covering all of the plant machinery, tools and other equipment. On the foreclosure sale, appellant Rich purchased all of the property, and Hamilton Tool thereupon ceased to do business and forfeited its Missouri charter.

Rich's and Rubin's connection with the situation had, as previously indicated, extended through the whole course of Hamilton Tool's seeking, obtaining and attempting to carry out the subcontract from Air-Tex. When the prospect of a subcontract with Air-Tex first began to lure Hamilton Tool, it had approached Rich and Rubin, to provide "some financing" for purposes of the undertaking. Rich and Rubin, who, from their own expressions, regarded themselves as seasoned business men, went over the elements of what would be involved, including Hamilton Tool's estimates of the costs and profits of the undertaking. After having canvassed the matter, they stated, "We will go along with you".

Appellants then went to the banker, whose name they used as a reference in the letters addressed by them to Air-Tex and to Clayton Mark & Co., and told him that they had entered into a deal with Hamilton Tool, from which they expected to make "lots of money"; that they were going to finance Hamilton Tool in the matter and would take charge of the business end of the venture; and that Hamilton Tool would "refer" to them "on certain purchases that they had to make" and that Rich and Rubin would "handle these for Hamilton". A special account was opened by them with the bank, under the name of the R & R Investment Fund, through which all funds in any way related to the subcontract were made to pass, including the monies turned over by them to Hamilton Tool for payment of retooling costs, wages and other obligations, as well as the re-

mittances received from Air-Tex under the subcontract as burster tubes were delivered, which remittances they had required Hamilton Tool to have Air-Tex make payable to them. Checks against the R & R Investment Fund could be drawn only by appellants themselves.

In the financing arrangements originally made between Hamilton Tool and appellants, it was orally agreed that all cash advances or loans by Rich and Rubin to Hamilton Tool were to be on a 4-months basis, with interest at 6 per cent, and with a 10 per cent financing commission or bonus to be deductible from the face amount of each such advance or loan as made. In the written agreement between them, however, covering Rich's and Rubin's right to assignments of the amounts that should become due from Air-Tex on the subcontract, it was provided that "the Assignor (Hamilton Tool) will pay to the Assignee (appellants) such sums of money as the Assignee may from time to time require either as interest or for its charges for such financial accommodation as may be granted by the Assignee". Rich and Rubin had subsequently made use of this provision to increase the interest rate payable on their "financial accommodation" to 2 per cent per month.

Another provision had been inserted by Rich and Rubin in the written agreement with Hamilton Tool, to the effect that they were not to be obligated to make any certain amount of loans or advances in relation to the subcontract, but that they should have "the right to determine whether to make any such future loan or loans or advances of money". Their letter to Clayton Mark & Co., however, contained no such qualification or limitation but purported to be an unconditional assurance or promise to Clayton Mark & Co. that they would provide "adequate financing" to Hamilton Tool "in furtherance" of the subcontract with Air-Tex.

On the language of appellants' letter, read in relation to the circumstances under which it was given and to the pur-poses which Hamilton Tool informed appellants that it was to be used to accomplish—as well as in the light of appellants' assumed control of all the financial incidents involved in getting the subcontract performed, including the furnishing or releasing of funds for making payments regularly on the account of Clayton Mark & Co., until it began to appear that the subcontract was not going to give rise to the profits which appellants had anticipated—we think that the trial court was entitled to hold that the letter was intended and regarded by the parties at the time as a promise on the part of appellants to Clayton Mark & Co. that they would provide the funds necessary to pay for the tubing required by Hamilton Tool in carrying out the subcontract, or, in other words, that they were personally guaranteeing to Clayton Mark & Co. that it would receive its money for the sale of such tubing, as to which it had refused to accept Hamilton Tool's credit.

As has been pointed out, appellants had told the banker, whose name they used as a reference in their letter to Clayton Mark & Co., that they were going to finance Hamilton Tool's subcontract venture and intended to handle "certain purchases" which had to be made in the matter, and on which Hamilton Tool would use their names for reference. Hamilton Tool did so use appellants' names in seeking to make purchase from Clayton Mark & Co. of the steel tubing necessary for the performance of the subcontract but was told that Clayton Mark & Co. was not willing to make a sale on this mere abstract basis. Before Clayton Mark & Co. would accept Hamilton Tool's order, it demanded that it be furnished with a letter from appellants, running directly to it, containing appellants' promise to provide "adequate financing" as to the subcontract venture.

Appellants gave the letter, knowing that the promise or assurance which it contained was being required as a direct condition for the granting of credit as to the tubing order.

In this factual setting, the statement, directly running to Clayton Mark & Co., that "we jointly and severally will provide adequate financing to Hamilton Tool * * * in furtherance of certain contracts issued to Hamilton Tool * * by Air-Tex", would be legally capable of importing an intention, understanding and responsibility of more than mere general declaration. Appellants knew, from the refusal of Clayton Mark to extend credit to Hamilton Tool on the basis of their previous letter to Air-Tex, that it was not content to accept or rely upon an abstract declaration on their part that they would provide Hamilton Tool with adequate financing to carry out the Air-Tex subcontract. Hamilton Tool specifically told appellants that Clayton Mark & Co. insisted upon an expression from appellants running directly to it of the nature contained in the Air-Tex letter, as a condition of selling the tubing on credit.

The natural implication of all this could properly be found to be that Clayton Mark & Co. was demanding that appellants make their abstract promise to provide "adequate financing * * * in furtherance of" the Air-Tex subcontract constitute one of specific commitment to it in relation to Hamilton Tool's attempt to purchase from it the necessary steel tubing for carrying out the subcontract. And since a promise or obligation on the part of appellants to provide adequate financing to Hamilton Tool in furtherance of the Air-Tex subcontract, made to Clayton Mark & Co. as a basis for getting it to make a sale of tubing to Hamilton Tool, after it had refused to accept the latter's credit, would be without commercial, legal or other practical reality, except as Clayton Mark & Co. could be expected to and would rely upon the letter as a commitment to it that appellants would provide such money as was necessary to enable Clayton Mark & Co. to receive payment for its sale of tubing, we think that the trial court was entitled, on the circumstances and setting of the situation, to regard the language of the letter as having been meant to convey and as having in fact conveyed that significance between the parties.

Such a reading cannot be contended to do violence to the language used by appellants, since the form and content thereof are without any such legal absoluteness as to require that the expression used be detached from the circumstances, setting and relations by which the giving of the letter was prompted and on the basis of which appellants were endeavoring to serve a special purpose. We do not think, as appellants in effect contend, that the language used was capable as a matter of law of having no other meaning than that appellants might, if they thereafter saw fit, loan some money to Hamilton Tool, on which contingency, as well as in amount or application to its sale, Clayton Mark & Co. was being left to take a chance.

Again, the actions of appellants, in their advancing or releasing of funds for the making of payments to Clayton Mark & Co., up to the time that they decided that the subcontract was not working out as they had anticipated and they set out to hedge as to their own financial position, were capable of being viewed and appraised by the trial court as having been engaged in by them pursuant to and in recognition of their letter, and hence as also amounting to such a construction of performance obligation by them as we think that the letter was intended to import. As has been noted, all of the payments received by Clayton Mark & Co. came entirely from funds which were turned over to Hamilton Tool by appellants for this specific purpose. And appellants had been without any hesitancy in thus acting to get Clayton Mark & Co. to make shipments to Hamilton Tool, until the last lot of tubing had been delivered. Only then did they become without apparent concern about providing money for getting Clayton Mark & Co. paid.

The trial court's holding that the language of the letter, read in relation to the setting, circumstances, declarations and actions of appellants, created

an obligation of guaranty against appellants is supported by well-established principles. "The question whether a disputed writing evidences a contract of guaranty is to be determined in view of the language thereof, as interpreted in the light of the attending circumstances." 24 Am.Jur., Guaranty, § 5, p. 876. Or, stated in slightly different form, "A determination of the dispute as to the character of the contract proceeds in view of the showing as to the intention of the parties, the view as to intention being decided by the language of the writing and the circumstances attending its execution". Id., § 12, p. 882. The law of Illinois, by which the parties agree that the question here is controlled, is to the same effect. Washington Boulevard Hospital v. Levin, 317 Ill.App. 150, 45 N.E.2d 573; Scovill Mfg. Co. v. Cassidy, 275 Ill. 462, 114 N.E. 181, 186.

Appellants' letter was, on its form, the setting of its furnishing, and the object intended to be effected by its giving, entitled to be regarded either as constituting a specific guaranty or, more generally, as being in the nature of a letter of credit, in favor of Clayton Mark & Co., as to such tubing as Hamilton Tool might require, and as should be furnished to it, "in furtherance of", or in other words for the performance of the Air-Tex subcontract. The circumstances under which appellants wrote the letter could properly be viewed as implying a request on their part that Clayton Mark & Co. supply such tubing to Hamilton Tool on the basis of their responsibility being behind the purchase.

"A letter of credit may be defined as a written instrument by which the writer requests or authorizes a person to whom it is addressed to pay money or deliver goods to a third person and which evidences an agreement whereby the writer assumes responsibility for payment to the addressee of the amount of the debt. Otherwise stated, a letter of credit is a letter authorizing the addressee to pay money or supply a commodity to a third person on the credit of the writer. * * * Credit having been extended by a person to whom such a letter is addressed, there is created between the writer and the addressee or creditor a distinct contract which is collateral to the contract between the creditor and the debtor; and in the event of default on the part of the debtor, the writer may be held liable by the creditor." 24 Am.Jur., Guaranty, § 20, pp. 888–889. See also First National Bank v. National Produce Bank, 239 Ill.App. 376.

"If a disputed writing is shown to have been intended to operate in the above described manner, it will be held to be a letter of credit, regardless of its form. * * * The intention of the parties is to be ascertained by a consideration of the terms of the letter as construed in the light of its purpose and the circumstances attending its execution." 24 Am.Jur., Guaranty, § 21, p. 889.

Appellants contend, however, that, even if the letter involved was capable of constituting a guaranty or letter of credit, it could not be held to have become so effective or operative, because of the failure of Clayton Mark & Co. to give express notice to them of its acceptance. The trial court held that appellants had been given and had regarded themselves as having had such notice in the circumstances of the situation as was legally required to make the letter operative in serving its intended purpose. Appellants had been informed immediately by Hamilton Tool that Clayton Mark & Co. had accepted the tubing order, after its receipt of appellants' letter, and they knew, from the previous refusal of Clayton Mark & Co. to accept the order on the basis of Hamilton Tool's credit, that such acceptance had been made on the basis of their letter. They also, as the trial court found, had knowledge at the time of each of the individual shipments which Clayton Mark & Co. so made. And, in accordance with the responsibility which their letter could be regarded as having been intended to import, they engaged in providing the money to make payment for the tubing

so being furnished, until the last of the tubing necessary to complete the subcontract had come into Hamilton Tool's hands, when they for the first time pretended to have no concern about whether Clayton Mark & Co. was paid or not.

It is not necessary here to consider whether the circumstances of the letter having been one furnished on the request of Clayton Mark & Co. and of Clayton Mark & Co. having immediately made formal acceptance of the order after receipt of the letter were sufficient as a basis for holding that the position of Clayton Mark & Co. was in the situation equivalent to that of an offeror as to the giving of the letter and that the receiving of the letter therefore itself gave rise to an obligation on the part of Clayton Mark & Co. to make sale of the tubing. If that status existed, there would, of course, be no need for any notice of acceptance to be received by appellants. See Davis v. Wells, 104 U.S. 159, 166, 26 L.Ed. 686.

The trial court, however, treated the letter as an offer on the part of appellants, requiring acceptance to make it operative, but held that there had been such notice or communication of acceptance to appellants as appellants had contemplated and as was legally sufficient in the situation. That holding is entitled to be sustained.

As with contract offers generally, notice of acceptance of an offer of guaranty is ordinarily necessary to the creation of liability. But unless the offer can be said to have so intended, notice of acceptance of a guaranty is not required to be in any particular form. Communication to the guarantor need not be of a form or in a manner beyond what the circumstances entitle it to be held that he contemplated or what his actions indicate that he has himself treated as sufficient.

■ Thus, Illinois law appears to recognize that, while notice of acceptance of a guaranty is in general necessary, communication and notice of such acceptance, appropriate to the particular situation, may be inferable from the circumstances. Vermont Marble Co. v. Bayne, 356 Ill. 127, 190 N.E. 291, 294.

Other courts have also so held. Thus, in Kleman v. Anheuser-Busch Brewing Ass'n, 3 Cir., 237 F. 993, 998, it was said: "Proof of notice may be made, as of other facts, by evidence either direct or circumstantial. In this case there is no direct evidence of notice, but (the guarantor) Kleman's relation to the loan transaction and his conduct in its inception, throughout its negotiation, and in its completion, constitute circumstances from which may very reasonably be drawn an inference of notice." And in Robinson v. Fidelity Trust Co., 8 Cir., 188 F. 37, 39, we said of the situation there involved that acceptance, and hence notice thereof, "appeared from the very course of the transaction."

The more modern rule goes even further than this. "Where the surety offers to guarantee an extension of credit to the principal and the credit is extended as the sole consideration for the surety's promise, the contract is complete upon the extension of the credit, but if the surety does not know of the extension of credit and has no adequate means of ascertaining with reasonable promptness and certainty that the credit has been extended and the creditor should know this, the contract of the surety is discharged unless within a reasonable time after the extension of credit the creditor exercises reasonable diligence to notify the surety thereof." Restatement, Security, § 86.

■ While it cannot perhaps be said that the Illinois cases furnish any basis for going as far as this, we think that the trial court was entitled to go the extent of holding, as it did, that the facts here sufficiently satisfied such requirement as existed under Illinois law for the communicating and receiving of notice of the acceptance made of the guaranty that is involved.

Notice of the acceptance was directly communicated to appellants by Hamilton Tool, by the information given to them that Clayton Mark & Co., which had refused to approve the order for tubing

until receipt of appellants' letter, had immediately after receipt of the letter approved the order. Appellants also knew, from their contact with the progress of the work under the subcontract, of the shipments of tubing being made by Clayton Mark & Co. pursuant to the approval made by it after receipt of appellants' letter. And appellants also seemingly gave recognition to these shipments and to the obligation of their guaranty to see that Clayton Mark & Co. was paid, by providing the money necessary to keep the shipments coming, until all of the tubing had been delivered. Their refusal at that time to provide further funds to pay Clayton Mark & Co. was entitled to be appraised as an unwarranted repudiation of their previously recognized obligation.

In this situation, we think the court could properly conclude that there had been such acceptance, communication, and receipt of notice in respect to appellants' guaranty as the parties contemplated in their contracting status, and also, by appellants' actions in having payments made to Clayton Mark & Co., such confirmatory recognition by appellants of the sufficiency of this acceptance, communication and notice, as to give rise to liability against appellants as guarantors under Illinois law.

 With the situation thus constituting one of guarantor relationship, and with that relationship having controlled the furnishing of the tubing involved, and with appellants having a liability on the basis of that intended relationship, we can see no need for us to consider whether appellants might also alternatively be found to have a liability as joint adventurers or in fraud, as the trial court did.

We accordingly vacate all of the provisions as to recovery and relief contained in the judgment entered, following the third paragraph thereof, and affirm the judgment of $20,453.53 entered against appellants, together with costs, jointly and severally, as guarantors.

Judgment modified and affirmed.